[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The appellant (hereafter "Trost") recites that he is aggrieved by a decision of the New Fairfield Conservation Commission (hereafter "Commission") in which it denied his application for a permit to allow the construction of an eight lot subdivision and access road. In order to take advantage of a statutory right of appeal, parties must comply strictly with the statutory provisions that create such a right. Bridgeport Bowl-O-Rama,Inc. v. Zoning Board of Appeals, 195 Conn. 276, 283 (1985). The appellant, as the owner of the property in question, is aggrieved by the decision of the Commission. Winchester WoodsAssociates v. Planning Zoning Commission, 219 Conn. 303, 308
(1991); Bossert Corporation v. Norwalk, 157 Conn. 279, 285. Service was timely and proper. See §§ 8-8, 22a-43 (a) of the General Statutes.
Trost is the owner of a 44.695 acre parcel of property located off Rocky Hill Road in the town of New Fairfield. In accordance with Inland Wetlands and Watercourses Act, § 22a-36 et seq. of the General Statutes, and the New Fairfield Inland Wetlands and Watercourses Regulations, he filed an application, dated July 10, 1996, with the Commission for the purpose of obtaining a permit to allow the construction of an eight lot subdivision and access road.[1] In an effort to facilitate the evaluation of the appellant's application, the Commission reviewed a report that was prepared by the King's Mark Environmental Review Team. That report assessed the impact of the proposed subdivision on the drinking water supplies in the surrounding area and the drinking water supply of the subdivision itself. The review team included the acting district conservationist, a geologist, a biologist/environmental analyst, a forester, and a wildlife biologist. CT Page 1227
The report discloses that the water supply problems are understandable given the local bedrock geology. The review team warned that similar problems are expected wherever and whenever wells are drilled into the Augen Granite. The report also emphasized that recharge of the groundwater system is another problem. The proposed subdivision, the report notes, is located in an area that probably plays an important role in the regional groundwater recharge, and therefore it would be prudent to minimize disturbance to the drainage and surface properties on the site. Since the thick overburden in the Trost subdivision is the site of enhanced recharge to the groundwater fracture system, the review team opined that careful attention should be paid to the design of the septic systems for the development. Strict adherence to the Public Health Code will ensure that septic systems are designed correctly and it is the town sanitarian's job to make sure that they are properly installed. Provided that the septic systems are properly designed and installed, septic system wastewater recharging the local groundwater should be suitably renovated and available for recharge to the bedrock aquifer.
With regard to drainage, the report declares that runoff from the new road and lots as they are developed is directed into the road drainage catch basins and culverts and also to the 50 foot wide greenbelt/buffer area. Again, as with development of the building lots, minimizing disturbance of stable natural areas, especially where seasonal storm runoff flows, will be important to lessen downhill impact. If the town wishes to require an undisturbed greenbelt/buffer, then driveways should not cross it. It also stressed the importance of erosion control measures. A review of the control plan prepared shows attention to details, but it is important to remember that implementation of the control measures is what will count.
The Commission also reviewed a letter from the Connecticut Department of Environmental Protection which stated that there are no wetlands or watercourses on portions of the plaintiff's property that the DEP inspected.[2] The letter concluded, however, that there are two separate intermittent watercourses located approximately 30 feet off the subject property."
It also noted that it was the opinion of that office that the proposed e s controls are inadequate to properly control anticipated erosion and sedimentation. It then recommended that the NFIWC exercise its jurisdiction in this matter because the proposal was CT Page 1228 likely to have a significant adverse impact on watercourses located off site. The DEP further advised the Commission to defer to the expert advice of their local sanitarian on issues relating to the siting of wells and septic system design. At the request of the Commission, the DEP visited the site a second time, and again concluded that there are no wetlands or watercourses on the portions of the property that were inspected.
One of the appellant's soil scientists also concluded that there are no intermittent brooks or watercourses on the subject property. By contrast, his other soil scientist noted that therewas evidence of an intermittent watercourse on a portion of the property.
Glenn Mirtl, an engineer from Fuss O'Neil Inc., submitted a letter which, like the DEP letter, identified certain problems with the appellant's erosion control plan. After the plan was revised, however, he submitted another letter which stated that if the project is constructed and maintained as indicated by the plans and calculations, there should be no problem with sediment leaving the site. One of Trost's civil engineers, one Jeanne Williamson from Consultants Engineers, Inc., authorized correspondence which expressed approval of the erosion control plan. The letter stated that proper maintenance and repair was essential to ensure good results. With the intended construction sequence and control measures proposed, it was their opinion that the project should be able to be constructed in a manner that would prevent a harmful effect upon downstream properties. A letter written by Charlene Taylor, sanitarian for the New Fairfield Health Department, stated that the proposed locations for the well and septic system met both the local and state health codes.
In addition to reviewing the aforementioned documents, members of the Commission had the opportunity to visit and inspect the subject property.[3] During one of the site walks, the Commission observed water flow and pooling of water on the property. Several members believed that a watercourse was present on the site. During another site walk, a representative from the DEP stated that he could not deny the existence of water, the flow of water, and a defined boundary on the property. When asked about the septic systems, the New Fairfield Director of Health stated that, although approval had been given to the proposed subdivision concept, the individual lots and their septic locations had not been approved at that time. CT Page 1229
Various experts and area residents testified before the Commission during public hearings that were held on October 23, 1996 and November 20, 1996. Several experts testified on behalf of Trost. Cynthia Rabinowitz, a soil scientist, offered evidence to the effect that the property lacked a certain watercourse characteristic, namely, channel definition, because the banks that would be there were non-existent or in one or two spots, very rudimentary at best. Rabinowitz continued by stating that the soil erosion and sedimentation control measures that were being proposed were elaborate, far-reaching, and very, very conservative in their ability to control the soil erosion problem that would not normally develop on a site with a slope like the existent one. She emphasized that the plan would prevent the off-site watercourses from being polluted. Douglas Divesta, a professional engineer with Consultants and Engineers, opined that the measures should be adequate enough to reduce any siltation that might occur during construction and have no adverse effects downstream. Peter Tavino, Trost's civil engineer, indicated that the basins may not have been sufficient for severe storms. He contended, however, that there were no alternatives to the plan because what was being done was keeping the status quo to those off-site watercourses. And, similarly, there was no increase of pollution to them at all because it was a zero increase in pollution and a zero increase in runoff.
Tim Simpkins. Director of Health for the town of New Fairfield, gave testimony concerning septic systems in the Rocky Hill area. He stated that he was aware of four or five failures in nine and a half years. Simpkins noted that a couple of those failures were fairly new and occurred because they weren't installed properly, and the other couple were because of age, like a car, eventually, needing to be replaced. With regard to the subdivision plan, Simpkins stated, as he did during a site walk, that each lot would have to stand on its own merits.
Several neighbors expressed their opposition to the proposed subdivision. The record reflects that one such neighbor is a professional geologist with ten years experience in environmental site assessments. He testified that there was an intermittent waterbody on the subject property. He then made the following four points:
1. Development and pavement of the surface and channelization of runoff via storm drains and swales would accelerate runoff and CT Page 1230 decrease recharge.
2. Decreased recharge would cause the water table to drop and increase the occurrence of wells running dry starting with those that are shallowest and nearest the top of the hill.
3. Accelerating the runoff would add sediment and water volume to Short Woods Brook and increase the frequency of downstream flooding and property damage such as washouts.
4. The new presence of petroleum contaminates from cars and new pavement, as well as organic waste from septic systems that may fail will inevitably introduce contamination to Short Woods Brook and affect the entire downstream area. The impact of past development of the area was clear to all. That impact was explained as septic problems, water supply shortages, flooding and property damage from increased stream flow. The conversion of the head water area into a subdivision would only serve to worsen these problems.
Russell Bentzen, a neighbor and civil engineer, identified several problems with the application. For example, he made negative comments regarding the construction sequence, the check dams, and the hay bales. He emphasized that mistakes in the plans were voluminous and that such mistakes would lead to irreversible erosion damage.
Kenneth Lace,[4] another Rocky Hill Road resident, spoke of a vernal pool on the property, which pool measures 30 to 40 feet across. The pool sits for weeks on end every spring and frequently in other seasons when raining. Others disclosed that there are wetlands on the site.
A nine year resident, read a letter written by a DEP Senior Environmental Analyst for the Water Compliance Unit. The letter, which was addressed to the prior owner of that resident's home, concerned the contamination of a well that was situated on that property. The letter recited that septic effluent from a new home that was north of that piece of property entered the well and contaminated the water. One suggested solution to this problem was to install a new well outside the area of contamination as a new bedrock well could be drilled on the property, up gradient of the present well. Unfortunately, this solution cannot be realized as a panacea. Bedrock in the area is massive and not all wells are able to yield enough water. The potential that the new well CT Page 1231 could eventually draw in contaminated ground water also exists, and a new well would have to be tested with some frequency. Bentzen added that, according to the records of the sanitarian, the septic systems in the Rocky Hill area had a 20.5 percent failure rate, and also submitted a photograph that showed evidence of effluent in the Rocky Hill area. Bentzen noted that Short Woods Brook frequently overflows and when this occurs, area residents have to park on Rocky Hill Road and wade through water to get to their homes.
Leonard Schmidt testified that before Laurel Mountain Estates was built, Short Woods Brook hardly ever overflowed. Since that development was completed, however, the brook frequently overflows. He pointed out that this has occurred even though the developers stated that no additional water would flow into the brook. Other neighbors testified that further development of the area would increase the frequency of flooding, contamination and erosion.
Members of the Commission expressed their concerns about the project during the public hearings. For example, the vice-chairman stated that he was very concerned of the amount of water coming off the site. He personally was concerned because he believed that he looked more at the septic system issue than anything else. On the old design, there was a question of the septic — which marginally met the town regulations the way the septic system was set up. His concern was, even though it's an engineered septic system, can the land handle a septic system in that area with the amount of water that's coming off? He added that the Commission did not endorse the DEP's conclusion that there are no watercourses on the property. It is significant to note that Trost and his representatives had more than ample opportunity to address the concerns of Commission members and area residents.
Subsequent to the public hearings, the Commission held two meetings in which all of the relevant evidence was considered, including the evidence submitted by the appellant's experts. At the end of the second meeting, the Commission voted unanimously to deny the application. The denial was based on the following reasons:
1. Section 22a-41 (1). The environmental impact of the proposed action. CT Page 1232
The proposed diversion and/or obstruction of the water flow caused by the construction of buildings, septic systems and driveways would have a negative impact to the existing, ever present channel of water runoff. That impact would only further injure the fragile hydrological instability of the area and of the watercourse and further weaken the natural flood controls of Shortwoods Brook.
2. Section 22a-41(4). The irreversible and irretrievable commitments of resources which would be involved in the proposed activity.
Due to the geological makeup of the area with its defined shallow granite base, there would be a significant adverse impact on the quality of the ground water within the immediate area and sufficient degeneration of the Shortwoods Brook System. The Commission had continually maintained that there is a potential for a long term negative effect of the intermittent runoff on placement of several proposed septic systems. Although these septic systems would be required to be engineered systems, existent water flow conditions observed during mild to heavy seasonal rainfall would present the potential of flooding septic galleys. This flooding would only cause irreversible downstream pollution damage to the quality of surface and underground water, and causing irreversible downstream pollution damage which would only degrade the health, welfare and safety of the citizens that use this vital resource.
3. Section 22a-41 (b). The alternatives to the proposed action. The application as presented was repeatedly reviewed and those areas of concern were addressed while the applicant was requested to provide alternatives. The agent for the applicant repeatedly stated during site walks and at the public hearing that there were no alternatives. In accordance with §22a-41 (b), which states in part: "in the case of an application which received a public hearing . . . a permit shall not be issued unless the commissioner finds . . . that a feasible and prudent alternative does not exist." The agent acting on behalf of the applicant has not accepted suggestions for a feasible and prudent alternative.
4. Section 22a-41a(2). The alternatives to the proposed action exacerbate problems with the area that the Commission's expert has recommended not be disturbed. CT Page 1233
5. Section 22a-41a(3). The relationship between short term uses of the environment and the maintenance and enhancement of long term productivity as a result of the introduction of sedimentation ponds will greatly injure the long term viability of an area which should not be disturbed. The short term use effectively destroys long term productivity in the recharge area.
6. Section 22a-41a(5). The character and degree of injury extends to abutting downstream property as identified by the DEP and Kings Mark Environmental Review Team.
7. Section 22a-41a(6). Because of the above damage to the recharge area that activity as part of the proposed subdivision is totally unsuitable for the area.
8. The opinion given by the DEP in a letter of November 20, 1996 that there is no wetland or watercourse on the Trost property as inspected on both site visits is contradictory to the Commission's opinion as to the definitions as interpreted by the DEP. The Commission was not in agreement that the prerequisite defined as "permanent channel and bank" could not be established. In effect, this channel and bank could include the boulders and rocks around which the flowing water moves.
The Commission also has made the following recommendations of alternatives to the applicant:
To redesign as set forth in a sketch drawn by the Commission on the Commission also has made the following recommendations of alternatives to the applicant:
To redesign as set forth in a sketch drawn by the Commission on a map provided by the applicant titled "P. Tavino mark up sketch of surveyor's map showing unnecessary seven lot alternative 7/9/96" and as discussed at the meeting. The redesign was to include:
1. Fewer lots.
2. Movement of the road out of the CNC areas as identified on the soil map.
3. The CNC area was identified and it was desirable that it be open space. The proposed Conrad Trost Trail should also be open space that is part of a protected strip of land extending CT Page 1234 from the State Forest through lot 5 and the CNC area.
4. Addition of a dry swale to provide secondary renovation for probable problems with septic systems as discussed.
In challenging an administrative agency action, the appellant has the burden of proof. The appellant must do more than simply show that another decision maker, such as the trial court, might have reached a different conclusion. Samperi v. InlandWetlands Agency, 226 Conn. 579, 587 (1993). The agency's decision must be sustained if an examination of the record discloses evidence that supports any one of the reasons given. The evidence however, to support any such reason must be substantial, and the credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency. This so-called substantial evidence rule is similar to the sufficiency of the evidence standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred. It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.
The substantial evidence rule is a compromise between opposing theories of broad or de novo review and restricted review or complete abstention. It is broad enough and capable of sufficient flexibility in its application to enable the reviewing court to correct whatever ascertainable abuses may arise in administrative adjudication. On the other hand, It is review of such breadth as is entirely consistent with effective administration. It imposes an important limitation on the power of the courts to overturn a decision of an administrative agency, and to provide more restrictive standard of review than standards embodying review of the weight of the evidence or clearly erroneous action. The United States Supreme Court, in defining substantial evidence in the directed verdict formulation, has said that it is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. Our court has followed that standard for several years. See Huck v. InlandWetlands Watercourses Agency, 203 Conn. 525, 539-542 (1987). The decision of the Commission must not be disturbed unless the CT Page 1235 decision is "arbitrary, illegal or not reasonably supported by the evidence." Red Hill Coalition, Inc. v. ConservationCommission, 212 Conn. 710, 718 (1989).
Trost argues that the Commission's decision to deny his application is not supported by substantial evidence. The Commission counters that the record provides substantial support for its conclusion. The Commissioner of Environmental Protection also contends that the Commission's decision does not violate the substantial evidence rule.
Our Supreme Court has had the opportunity to apply the substantial evidence rule on several other occasions. InFeinson v. Conservation Commission, 180 Conn. 421 (1980), for example, the applicant submitted an application to the Newtown Conservation Commission to conduct regulated activity in an inland wetland. The only witness to testify at the public hearing was the appellant's design engineer. No public official or member of the public expressed any opposition to the application. After the hearing, the commission held a meeting to which neither the applicant nor his expert were invited. After discussion, the appellant's application was denied. The commission's denial was apparently based upon data presented by one of its members.
The court held that the trial court properly set aside the commission's decision and sustained the appeal. The court was troubled by the fact that nowhere in the public hearing, or at any other time and place, was the applicant afforded a fair opportunity to hear the commission's fears and to attempt to allay them. The questioning of the applicant's witness at the public hearing did not give warning that his evidence was to be entirely discredited. On the contrary, that hearing as transcribed, suggests that the proffered evidence was on the whole satisfactory to the commission. Thus, the court concluded that a lay commission acts without substantial evidence, and arbitrarily, when it relies on its own knowledge and experience concerning technically complex issues such as pollution control, in disregard of contrary expert testimony, without affording a timely opportunity for rebuttal of its point of view.
In Huck v. Inland Wetlands Watercourses Agency,
supra, four experts testified in support of the application including the director of the environmental health office in Greenwich. In holding that the agency's decision was supported by the record, the court emphasized that an administrative agency is CT Page 1236 not required to believe any witness, even an expert, nor is it required to use in any particular fashion any of the materials presented to it so long as the conduct of the hearing is fundamentally fair. The court noted that the transcript of the hearing revealed active and probing participation by agency members in questioning these experts concerning the background and input of their proposals and opinions. The court also stressed the importance of the agency's visit to the subject property. Knowledge obtained through personal observations of the locus may properly be considered by the agency in arriving at reasons given for its denial. Because substantial evidence supported the agency's decision, the court concluded that the agency did not whimsically ignore substantial expert testimony.
The foregoing case law indicates that the instant appeal cannot be sustained. Unlike the applicant in Feinson.
Trost was afforded a fair opportunity to hear the concerns of the Commission and the public. Furthermore, he and his representatives were given more time to allay the fears of Commission members and area residents. Although he presented several expert witnesses, the Commission was not required to believe any of them. The record reflects that the Commission and the public actively questioned these experts about the background and input of their proposals and opinions. Moreover, the Commission's denial was based in part upon observations it made while visiting the site.
At the two meetings that took place after the public hearings, the Commission evaluated all the evidence and carefully applied the factors set forth in § 22a-41 of the General Statutes.[5] In light of the Commission's own observations, the testimony of Ranlet and other neighbors, the findings of Rabinowitz, and the comments of Tessitorie, the record supports the Commission's finding that there was an intermittent watercourse on the site. In addition, there is no dispute that there are intermittent watercourses off the subject property. There is no question that activities occurring outside a wetlands area may have a significant adverse impact on the wetland itself Obviously, pollution of wetlands can be caused by actions on parcels of land adjacent to and perhaps even remote from designated wetlands areas. Manatuck Associates v. ConservationCommission. 28 Conn. App. 780, 791 (1992).
The record indicates that development of Trost's property could harm the watercourses in the area. The King's Mark report CT Page 1237 cautioned that disturbance should be minimized in the area of the proposed subdivision. The DEP opined that the proposal would have an adverse impact on off site watercourses. Tim Simpkins stated that, although the Health Department had approved the proposed subdivision concept, the individual lots and their septic locations had not yet been approved yet. Simpkins also testified that he was aware of septic failures in the area. Ken Ranlet testified that the proposal would cause flooding and pollution. Russell Bentzen opined that the plans would lead to irreversible erosion damage.[6] Other neighbors gave testimony concerning flooding, septic problems, contamination, and erosion. Although Peter Tavino stated that there are no alternatives because the proposal maintains the status quo, he admitted that their basins may not be able to handle a severe storm.[7]
In view of the foregoing, the record supports the Commission's finding that the appellant's proposal posed a threat to the area watercourses. See General Statutes § 22a-36;[8]Manatuck Associates Conservation Commission. supra, 791-792; Kaeser v. Conservation Commission,20 Conn. App. 309, 314-315 (1989). Although another decision maker might have reached a different conclusion, it cannot be said that the Commission's findings and decisions supported by the factual predicate in the record was not supported by substantial evidence. In accordance with the foregoing, the appeal is, accordingly, dismissed.
Moraghan, J.